**UNITED STATES of America,
Appellee,**

v.

**Howard JACKSON, Jr., Appellant.**

**UNITED STATES of America,
Appellee,**

v.

**Billy Joe PAYNE, Appellant.**

**UNITED STATES of America,
Appellee,**

v.

**Robert H. WILLIS, Appellant.
Nos. 71–1018–71–1020.**

United States Court of Appeals,
Ninth Circuit.

Sept. 13, 1971.

Tom O'Toole (argued), Tom Karas, Phoenix, Ariz., for Howard Jackson, Jr.

Michael E. Bradford (argued), Phoenix, Ariz., for Billy Joe Payne.

Joel Jay Finer (argued), Tucson, Ariz., for Robert H. Willis.

Charles Diettrich, Asst. U. S. Atty. (argued), Richard Burke, U. S. Atty., N.

Warner Lee, Asst. U. S. Atty., Phoenix, Ariz., for appellee.

Before BARNES, HAMLEY and HUFSTEDLER, Circuit Judges.

HAMLEY, Circuit Judge:

Howard Jackson, Jr., Billy Joe Payne and Robert H. Willis were jointly tried and convicted of bank robbery with a gun, in violation of 18 U.S.C. § 2113(a)–(d). Their individual appeals have been consolidated. We affirm all three judgments.

At 11:45 a. m., on April 28, 1970, three masked Negroes robbed the Valley National Bank, Phoenix, Arizona, of over ten thousand dollars. Employees and customers testified that all three robbers wore stocking masks and at least some of them were armed. The three defendants were arrested and charged with this crime.

All three defendants filed motions to suppress various items of physical evidence. At the pretrial court hearing on these motions there was a confrontation between defendants and five Government eyewitnesses, in the absence of counsel, which provides the basis for defendants' first argument on appeal.

The hearing on the motions to suppress was scheduled to begin at 9:30 a. m. on September 1, 1970. The eyewitnesses came to the courtroom about that time to participate in this hearing and took seats in the spectators' section. The hearing, however, was delayed as the court had asked opposing counsel to first meet in an adjoining room to examine evidence. Counsel for defendant Jackson passed through the courtroom shortly after 9:30 a. m. and saw the Government witnesses sitting in the courtroom. He knew that defendants would be brought to the courtroom for the hearing. However, he did not anticipate that this would occur in the absence of counsel and therefore made no effort to postpone the prospective confrontation until counsel were present.

While opposing counsel were busily engaged in the adjoining room for about an hour, and in accordance with his usual routine, the United States Marshal brought defendants into the courtroom under guard and seated them behind defendants' counsel table. This was done without the knowledge of counsel for either side. While defendants were seated in the courtroom prior to the commencement of the hearing the eyewitnesses took occasion to observe them.

Most of the witnesses later testified that they assumed the three persons who had been brought in by the marshal were the persons who had been indicted for the offense. Two of the witnesses indicated that they, and the other witnesses, left the courtroom during this period, looked back at the defendants through the window in the courtroom door, and that there was some conversation between them as to the identity of the three individuals who had been seated at the counsel table.

When counsel returned to the courtroom about 10:40 a. m., and the suppression hearing commenced, the court excluded the witnesses from the courtroom except when they were called individually to testify, and admonished them not to discuss the case with each other. Only thereafter did counsel for Jackson and Willis call the court's attention to the confrontation which had occurred, and no objection or motion pertaining to the incident was made at that time.

The five eyewitnesses were called to the witness stand during the suppression hearing which continued into September 2, 1970. At this time the three defendants were apparently scattered about the courtroom. Among other questions, each witness was asked in turn whether he saw in the courtroom any of the robbers. Witnesses Wiggins and Palmer identified defendants Payne and Jackson. Witness Esmeier identified defendant Willis. Witness Moulton identified Payne and witness Welch identified Payne and Willis. All five testified that their identifications were based upon their observations at the time of the robbery, and they were not assisted by the

confrontation which had occurred on the previous day.[1]

Counsel for defendants voiced no objection to these courtroom identifications during the suppression hearing. When witness Esmeier asked if he could stand up while he looked at persons in the courtroom, the court asked all of the defendants to stand. They did so. None of the defense counsel objected to this procedure. At least in the absence of objection, this practice does not deprive a defendant of due process. United States v. Zammiello, 432 F.2d 72, 73 (9th Cir. 1970).

While the suppression hearing was in recess defendants formally moved to suppress the in-court identification of defendants by the five Government eyewitnesses. Counsels' ground for this motion was that the confrontation on September 1, 1970, tainted the witnesses' ability to make reliable in-court identification and thereby deprived defendants of due process. The motion was denied. At the trial the five eyewitnesses repeated their in-court identifications of defendants. While witness Welch was making her identification the court again, without objection, had all of the defendants stand. During the trial defendants several times renewed their motions to suppress the in-court identifications, but the motions were denied.

All of the defendants here contend that the in-court identifications described above deprived them of due process of law.

■ Defendants are entitled to reversal if the confrontation on September 1, 1970, "was so unnecessarily suggestive and conducive to irreparable mistaken identification" as to amount to a denial of due process of law. Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.

Ed.2d 1199 (1967); Foster v. California, 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L. Ed.2d 402 (1969); Coleman v. Alabama, 399 U.S. 1, 3–6, 90 S.Ct. 1999, 26 L.Ed. 2d 387 (1970). See Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed. 2d 1267 (1968). As observed in Stovall, 388 U.S. at 302, 87 S.Ct. 1967, such a claimed violation of due process of law depends upon the totality of the circumstances surrounding the confrontation at issue. Stovall further indicates that the relevant considerations are not limited to those bearing upon the suggestive character of the confrontation itself, but include those pertaining to the reasons why the confrontation occurred. In addition, Foster, supra, 394 U.S. at 443, 89 S.Ct. 1127, indicates that the spontaneity of the witness' identification at the confrontation is to be considered; while Coleman, supra, 399 U.S. at 5–6, 90 S.Ct. 1999, teaches us that we are also to weigh the question of whether it was the confrontation, or an independent source,[2] which formed the basis of the witness' later in-court identification. Finally, both Foster, 394 U.S. at 443, 89 S.Ct. 1127, and Coleman, 399 U.S. at 6, 90 S.Ct. 1999, treat as relevant the expressions of law enforcement officials to the witness concerning the identity of the individual exhibited.

An examination of the facts in the case at bar, in light of the factors relied upon in the above Supreme Court opinions, convinces us that, considering the totality of the circumstances, defendants were not deprived of due process under the Fifth Amendment by the September 1, 1970, confrontation. The circumstances which persuade us are: (1) the confrontation was not planned by prosecuting or enforcement officials, but was inadvertent; (2) no officials indicated to the witnesses that the men led into the

---

1. All of those witnesses had previously inspected groups of photographs in an effort to identify the robbers, but with little success. Defendants raise no question here concerning the validity of the photo-identification procedures. There had been no lineup, although the three defendants

had all been available for at least a month.

2. See also, United States v. Wade, 388 U.S. 218, 241–243, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 269–274, 87 S.Ct. 1951, 18 L.Ed. 2d 1178 (1967).

courtroom were the defendants in the bank robbery case, or even connected with the case in any way; (3) the assumption made by some of the witnesses that these were in fact the defendants appears to have stemmed as much from the witnesses' spontaneous recognition of the men based upon their observations at the time of the robbery, as from the fact that the men were seated at the counsel table; (4) all of the eyewitnesses who participated in the confrontation and later testified at the suppression hearing and the trial, testified that the confrontation did not assist them in making their in-court identifications; (5) there was substantial evidence, other than from these eyewitnesses, connecting the three defendants with the robbery; and (6) the inadvertent confrontation prior to the suppression hearing was less suggestive than the "stand up" procedure followed, in the presence of counsel and without objection, at the suppression hearing and the subsequent trial.

In reaching the conclusion that the defendants were not deprived of due process in this case, we do not intend to intimate that we will, in other and more aggravated circumstances, condone the use by prosecuting attorneys of pre-testimony courtroom confrontations to "firm up" the uncertain memories of potential witnesses. In this respect we agree with the District of Columbia Circuit that, where a normal jailhouse lineup could have been arranged, the use of a non-lineup confrontation " * * * is, at the least, a practice fraught with perils to a degree suggesting its sparing use as the part of prudence." Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1240–1241 (1968). Rather, we decide here only that the circumstances of the present case are not so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L.Ed.2d 1247 (1968), *quoted in* Coleman v. Alabama, *supra,* 399 U.S. at 5, 90 S.Ct. 1999.[3]

With reference to the confrontation incident, defendant Willis invokes not only the Due Process Clause of the Fifth Amendment, but the Assistance of Counsel Clause of the Sixth Amendment. In support of this argument, Willis places primary reliance upon the lineup cases, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967).

In our view, however, the teaching of those cases does not apply to an inadvertent pretrial courtroom confrontation of the kind which took place in this case. *See* United States v. Ballard, 418 F.2d 325, 327 (9th Cir. 1969). Defendants were not brought into the courtroom in an effort to assist the eyewitnesses in identifying them as the robbers. Moreover, there is nothing to indicate that if defendants' counsel had then been present they would have done any more to alleviate the supposed prejudice than they did at the subsequent suppression hearing and trial, as described above. We conclude that this incident did not de-

---

3. It should be noted that in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) the Supreme Court gave no indication as to whether or not the confrontation which there occurred had been impermissibly suggestive; instead, the Court based its decision on the *necessity* for the confrontation. In fact, of the Supreme Court cases which have considered this confrontation issue, only Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) has reversed a conviction because of the impermissible suggestiveness of the confrontation; and the facts of the present case fall far short of the aggravated circumstances in *Foster,* which included two lineups, one of which unmistakably highlighted the defendant, as well as a one-to-one confrontation. *See* Coleman v. Alabama, 399 U.S. 1, 3–6, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed. 2d 1267 (1968).

Moreover, if the striking similarity of the case at bar to United States v. Ballard, 418 F.2d 325, 327 (9th Cir. 1969) does not compel our decision here, it lends clear support, at the very least, to the conclusion we have reached.

prive defendants of the assistance of counsel.

On the afternoon of the day of the robbery, April 28, 1970, officers found items in a trash can outside Rooms 19 and 20 of Hall's Motel, Phoenix, Arizona, which were received in evidence as Government's exhibits 5, 7 and 8. They also found an item in a trash can in Room 20 of the motel, which was received in evidence as Government's exhibit 6. The district court denied defendants' motions to suppress this evidence as the product of an unlawful search and seizure. Defendants here urge that the trial court erred in admitting these items into evidence.

■ Defendants advance two reasons why this search and seizure was unlawful. The first is that the seizure of the articles at the motel was the fruit of an illegal seizure and interrogation of defendants which had occurred four days prior to the bank robbery.

On April 24, 1970, officers Montgomery and Gibson of the Phoenix Police Department were on duty working the 7:00 p. m. to 3:00 a. m. shift. They were in plain clothes and were in an unmarked patrol car. At approximately 11:20 p. m. they received a radio report that a liquor store had been robbed at Sixteenth Street and Osborn, Phoenix. According to this report, the robbery had been committed by two Negro males wearing nylon stocking masks, who had departed in an easterly direction behind the store.

The officers were experienced and were familiar with the area. They proceeded immediately to a location at Twentieth Street and Roosevelt. They did this because they felt that Twentieth Street would be a possible escape route. Twentieth Street and Roosevelt is a primarily Mexican neighborhood and from the Roosevelt intersection Twentieth Street heads directly to a primarily Negro neighborhood in the Van Buren area. Between Twentieth Street and Roosevelt

and Sixteenth Street and Osborn, the scene of the robbery, there were four major intersections with stoplights, as well as numerous cross streets.

About one minute after reaching Twentieth Street and Roosevelt, the officers saw a 1959 white Cadillac four-door automobile with a New Mexico license plate, southbound on Twentieth Street, with three Negro males inside. The officers trailed the Cadillac to Van Buren, and brought it to a stop in the 1900 block of East Van Buren, by flashing a red light.

The officers stopped the car because they felt the three persons inside were possible suspects in the liquor store robbery. It was the intention of the officers to detain the three suspects temporarily for purposes of "field interrogation." This meant the obtaining of information involving names, addresses, occupations and the reason for being in Phoenix. Upon stopping the Cadillac, one officer approached on the driver's side and the other on the passenger side. The three persons in the Cadillac turned out to be Willis, Payne and Jackson, with Willis as driver. The officers identified themselves and requested the information above indicated. No *Miranda* (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) warning was given, and the car was not searched.

Willis and Payne produced identification. Jackson, however, did not have any. The entire sequence of events lasted from twenty to thirty minutes. The information obtained from the documents presented by Payne and Willis and orally from Jackson was recorded by one of the officers on a form field interrogation card, and the three occupants of the Cadillac departed in their car.[4]

After the bank robbery occurred on April 28, 1970, the police officers recalled the similarity in description between the report that the three Negro bandits drove a white Cadillac getaway car after

4. We are not certain from the record before us whether the field interrogation card was received in evidence. But in any

event, that card contains nothing tending to link defendants with the bank robbery on April 28, 1970.

the bank robbery, and the description of three Negro males driving a 1959 white Cadillac on April 24, 1970. On the basis of this recollection, the police officers proceeded to the Hall's Motel address which was recorded on the field interrogation card and made the search and seizure under discussion.

In urging that the stopping and questioning on April 24th under the described circumstances was unlawful under the Fourth Amendment, defendants rely primarily upon Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). They argue that the officers were acting only on a "hunch"; point out that, whereas the liquor store robbery was committed by two Negroes, there were three in the Cadillac on April 24; and note that there were numerous alternative "get-away" routes from the liquor store robbery.

*Terry* involved the stop and frisk of a person on a public sidewalk, not in an effort to apprehend one who had just committed a particular crime, but because of what the officer regarded as generally suspicious conduct. Incriminating evidence was found, consisting of a concealed weapon, and the seizure of that evidence was challenged in the prosecution for carrying the concealed weapon. The Supreme Court affirmed the conviction.

While the facts of *Terry* vary substantially from those of the case before us, the rationale of that decision is equally applicable here. *Terry* notes that there can be a "seizure" of a person in the Fourth Amendment sense, even where there is no formal arrest. The legality of such a seizure depends not upon whether there was probable cause to make an arrest, but upon whether there was a violation of the general proscription against unreasonable searches and seizures. *Terry*, at 20, 88 S.Ct. 1868.

In determining whether such a seizure is "unreasonable," the judicial inquiry " * * * is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, at 19–20, 88 S.Ct. at 1879.

The *Terry* Court also called attention to the observation in Camara v. Municipal Court, 387 U.S. 523, 536–537, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), that there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." In *Terry* the Court also announced this general test:

" * * * in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880.

Applying these considerations to the circumstances concerning the April 24, 1970 stopping and interrogation of defendants, we conclude that the action of the police officers on that occasion was reasonable and hence not violative of the Fourth Amendment.[5]

Summarizing our reasons for reaching this conclusion:

First, the intrusion upon the personal liberty of Willis, Payne and Jackson on April 24, 1970, was relatively innocuous. They were not frisked. Their Cadillac was not searched. No incriminating evidence was seized. There was no rough treatment or unnecessary public indignity. While the interrogation period was somewhat protracted, this is explainable because Jackson carried no identification.

Second, the police officers were faced with an emergency. They had been advised that a liquor store had just been robbed. They rationally inferred that the robbers would attempt to get away

---

5. In so concluding, we assume that the stopping of defendants on that occasion was a "seizure" of them in the *Terry* sense, notwithstanding the testimony of the officers that defendants were at all times free to go on their way.

by automobile. It was their duty to try to detect and apprehend the robbers if they came within the officers' area of responsibility.

Third, the officers had been told that the robbers were two Negroes and it was rational for them to infer that there might be a third person involved as a "look-out" or driver. The officers were also experienced in such matters and rationally inferred that the Negro robbers might seek a haven in the Negro area of Phoenix which could lead them to drive out Twentieth Street.

Fourth, the Cadillac with its three Negroes approached along Twentieth Street, headed in the direction of the Negro area of the city. The circumstances called for swift action.

Under these facts the officers acted reasonably in stopping the Cadillac and questioning the occupants concerning their identity and residences. This was intelligent, effective police work. If police officers may not do what was done here, law enforcement would be seriously crippled. The Fourth Amendment was not intended to handcuff the police in their reasonable effort to handcuff criminals. *See also,* Gilbert v. United States, 366 F.2d 923 (9th Cir. 1966); Wilson v. Porter, 361 F.2d 412 (9th Cir. 1966).

■ No *Miranda* warning was necessary before the officers questioned defendants on April 24, 1970, as to their identity and places of residence. Disclosure of name and address is an essentially neutral act. It identifies but does not by itself implicate anyone in criminal conduct. California v. Byers, 402 U.S. 424, 91 S.Ct. 1535, 1540, 1541, 29 L.Ed.2d 9 (1971).

But if we are mistaken in deciding that the stopping and interrogating on April 24, 1970, was not unlawful, we in any event conclude that the connection between that conduct and the discovery of the challenged evidence "became so attenuated as to dissipate the taint." *See* Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed.

307 (1939), quoted in Wong Sun v. United States, 371 U.S. 471, 487, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963).

■ The interrogation took place four days *prior* to the crime with which we are concerned. No information was gained during the interrogation which provided substantive evidence in the bank robbery prosecution or which, as in *Wong Sun,* purported to reveal where incriminating evidence could be found. The information gained—names, addresses descriptions—would have been wholly innocuous were it not for the subsequent eyewitness accounts of the bank robbery. The information gained on April 24, made it possible for the officers to make a prompt investigation at Hall's Motel. But it would be speculative to conclude that, but for such information, the police would not have identified defendants or learned their place of residence.

We accordingly hold that the seizure of evidence made at Hall's Motel on April 28, 1970, was not tainted by the stopping and interrogation which occurred four days earlier.

Defendants, however, also argue that the search and seizure at Hall's Motel was illegal because the officers did not have a search warrant.

■ As before stated, one item was found in Room 20. Mrs. Lambert, owner and operator of the motel, believed Room 20 had been vacated and, on that premise, gave the officers permission to search that room. We have reviewed the circumstances which led Mrs. Lambert to conclude that the room had been vacated and believe that they were ample to support her view. Defendant Jackson testified that the room had been vacated. When the officers entered the room there was nothing to put them on notice that the room was still occupied. The only item seized in that room was found in a trash can. Under the evidence we conclude that the room was then vacant. Defendants thus may not complain of the search of that room and the seizure of an item from a trash

can therein. Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); United States v. Kress, 446 F.2d 358 (9th Cir. 1971).

The other items seized at the motel and later received in evidence were taken from a trash can outside Rooms 19 and 20. What a person knowingly exposes to the public is not a subject of Fourth Amendment protection. Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). When defendants placed articles in this public trash can outside the room, they surrendered their privacy with regard to those articles. *See* United States v. Minker, 312 F.2d 632, 634 (3d Cir. 1962). *See also*, Wattenburg v. United States, 388 F.2d 853, 857 (9th Cir. 1968).

After being arrested at the motel on April 28, 1970, for failure to register as an ex-felon, defendant Jackson was transported to the Phoenix Police Department. An officer then removed several strands of hair from Jackson's head for the purpose of expert comparison with hair samples found in the stocking remnants seized at the motel and in a stocking mask found in the alley adjacent to the bank. Jackson moved to suppress any evidence concerning the hair samples on the ground that they were taken at a time when Jackson had requested, but did not have, the assistance of counsel, and that they were taken without prior authorization of the court, and in the absence of exigent circumstances.[6]

According to Jackson's testimony, the hair was not taken in a cruel or oppressive manner or under circumstances or by means that would shock the conscience of the court. Removal of hair samples has been held not to violate due process of law. *See* Grimes v. United States, 405 F.2d 477, 479 (5th Cir. 1968). Nor, although accomplished in the absence of counsel, do we believe it denies an arrested person's Sixth Amendment right to the assistance of counsel. It is no more a critical stage of the prosecution than is fingerprinting.

Defendant Jackson contends that the trial court erred in refusing to give his requested accessory-after-the-fact instruction. Jackson argues that the evidence would have supported a jury finding that Jackson knew the bank robbery had been committed and that he wilfully assisted the offenders in order to hinder their apprehension. But, Jackson urges, the jury, if properly instructed, could have found that he did not engage in the robbery.

Jackson was not charged with a violation of 18 U.S.C. § 3, accessory after the fact, which is a separate and distinct crime from bank robbery with a gun, with which he was charged. *See* Orlando v. United States, 377 F.2d 667, 670 (9th Cir. 1967), later vacated on other grounds, 387 F.2d 348 (9th Cir. 1967). There was substantive evidence connecting Jackson with the actual robbery. The requested instruction was properly rejected.

Defendant Willis contends that the failure of the Government to transcribe the grand jury proceedings was in violation of his Fifth Amendment rights to be indicted by a grand jury and to due process of law, and his Sixth Amendment right to confront the witnesses against him.

It is established that no minutes of the grand jury proceedings were kept. Thus acceptance of this argument would require dismissal of the indictment.

This court has consistently, and recently, held that the recording of grand jury proceedings, at least in the absence of a prior request therefor, is permissive and not mandatory. *See* United States v. Ybarra, 430 F.2d 1230, 1233 (9th Cir. 1970); United States v. Thoresen, 428 F.2d 654, 666 (9th Cir. 1970); Jack v. United States, 409 F.2d 522,

---

6. Jackson also argued that the hair samples were the tainted fruit of the April 24, 1970 highway interrogation—a matter we have already sufficiently discussed.

524 (9th Cir. 1969); and Loux v. United States, 389 F.2d 911, 916 (9th Cir. 1968). We decline to re-examine these decisions.

Affirmed.