UNITED STATES of America, Appellee,

v.

Terrill Wayne JEWETT, Defendant-Appellant.

No. 75-1067.

United States Court of Appeals, First Circuit.

July 15, 1975.

Donald Grey Lowry, Portland, Maine, with whom Lowry & Platt, Portland, Maine, was on brief, for appellant.

Rufus E. Stetson, Jr., Asst. U. S. Atty., with whom Peter Mills, U. S. Atty., and John B. Wlodkowski, Asst. U. S. Atty., were on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

On May 23, 1974, at 11 a. m., two men robbed the Forest Avenue branch of the Canal National Bank in Portland, Maine. One of the men displayed a handgun and took the money at the teller's cage; the other carried a sawed-off shotgun and remained quietly near the entrance. At defendant Jewett's trial for bank robbery and illegal possession of an unregistered firearm, the bank employees testified that this second man wore a yellow jacket and a black wig similar to those found, along with the shotgun, in the getaway car shortly after the robbery. Bank teller Lund identified him as the second man in the bank, and witness Jurenas identified him as a passenger in the getaway car. A fingerprint expert testified that Jewett's fingerprints were found on several internal parts of the shotgun, which had been purchased the day before the robbery.

In defense Jewett called several alibi witnesses, whose testimony the prosecution sought to rebut by the testimony of Detective Ross of the Portland police. The jury could not reach a verdict on the robbery count, but convicted Jewett of the firearms offense.

Defendant first contends that witness Lund's in-court identification of him was irreparably tainted by a fleeting confrontation between them that occurred in the hall prior to the prelimi-

nary hearing before the magistrate.[1] We observe in passing that while Lund did identify defendant as present in the bank during the robbery, testimony which the jury evidently did not believe beyond a reasonable doubt, she never testified that he had possession of a firearm. Hence the extent to which her identification prejudiced defendant with respect to the crime of which he was convicted must remain unclear. At any rate, without in any way condoning the government's carelessness in contributing to this confrontation, we believe that it was not, in the totality of the circumstances, *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), *Stroud v. Hall,* 511 F.2d 1100, 1101 (1st Cir. 1975), "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny defendant due process of law. *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). The confrontation here closely resembles those in *United States v. Jones,* 512 F.2d 347 (9th Cir. 1975) and *United States v. Jackson,* 448 F.2d 963 (9th Cir. 1971), *cert. denied sub nom. Willis v. United States,* 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972).[2] As in those cases it was apparently inadvertent and other substantial evidence linked defendant to the crime. Lund had previously given an accurate description of the robber[3] and the U. S. Attorney's gratuitous question, although unfortunate, was no more suggestive than the prosecution's conduct in *Jackson.*

Nor do we think that the sixth amendment right to counsel was violated by the inadvertent confrontation here. *Id.* at 967–68.

 The contention that witness Jurenas's in-court identification of defendant was tainted by her prior impermissible photographic identification is also without merit. The photographic line-up itself was completely non-suggestive, and the mere fact that the spread contained only five photographs does not render it unduly suggestive. *United States v. Lawrence,* 499 F.2d 962 (4th Cir. 1974). Although Jurenas observed Jewett from a few feet away only very briefly, *see Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *United States v. Bamberger,* 456 F.2d 1119 (3d Cir.), *cert. denied sub nom. Elam v. United States,* 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972); *United States v. Davis,* 407 F.2d 846 (4th Cir. 1969), the circumstances were so surprising that she could well have retained a clear memory of his appearance, and her description on the day of the crime apparently tallied well with Jewett's appearance, *see United States v. Higgins,* 458 F.2d 461, 465 (3rd Cir. 1972). While six months elapsed between her observation and the photographic identification, *see Neil v. Biggers, supra* (seven months), we cannot say the identification was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" justify-

---

1. Lund was seated in the U. S. Attorney's office, back to the door, while the Attorney conversed with a man she later realized was defendant's counsel. The door opened behind her and she heard a voice say "they are going upstairs." Glancing around she caught sight of part of defendant's face in the doorway. Subsequently defendant walked by her in the hall outside the office and proceeded upstairs with counsel. The Assistant U. S. Attorney came out and asked her if she saw anybody she knew, and she replied she wanted a better look at defendant. She had no difficulty identifying him as the robber at the preliminary hearing.

2. In *Jones* several witnesses viewed defendant in the hallway prior to trial. In *Jackson* de-

fendants were seated under guard at the counsel table for about an hour in a courtroom before a preliminary hearing while several witnesses, most of whom assumed that the individuals were the defendants, looked on and discussed their identity. *See also United States v. Matlock,* 491 F.2d 504 (6th Cir. 1974).

3. Weighing the factors set forth in *Neil v. Biggers, supra,* we note that Lund was 30–40 feet distant from the robber, who was standing in an adequately lighted part of the bank, and "stared" at him for one to two minutes. The confrontation occurred only two months after the crime, and though Lund was unsure of his identity in the hall she had no trouble identifying him at the hearing.

ing reversal. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Nor do we perceive any inconsistency between the jury's conviction of defendant on the firearms charge and its inability to reach a verdict on the robbery charge. *See Hamling v. United States,* 418 U.S. 87, 101, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

 Defendant also raises a series of questions as to the rebuttal testimony of Detective Ross. The sequestration of witnesses is a matter within the trial court's discretion. *United States v. Mallis,* 467 F.2d 567 (3d Cir. 1972). Its decision will not be questioned absent a showing of prejudice. *United States v. DeAngelis,* 490 F.2d 1004, 1008 (2d Cir.), *cert. denied,* 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974). Detective Ross's testimony contradicted that of defendant's alibi witnesses only in immaterial details[4] and could not realistically have prejudiced defendant. Nor do we think his testimony so impermissibly transcended the scope of defendant's case in chief as to constitute the court's reception of it an abuse of discretion. *See United States v. Jalbert,* 504 F.2d 892, 893 (1st Cir. 1974). Defendant objects only to Ross's recitation of a mildly incriminating remark of defendant's.[5] While defendant's witnesses testified only to the fact of the conversation between Ross and defendant and not to its content, they did imply that Ross was in

some opprobrious sense "after" Jewett and initiated the interchange by tapping him on the shoulder. The prosecution was entitled to rebut the implications of this testimony by showing that Ross did not want Jewett and that Jewett in fact approached him first by asking the question which Ross recounted. Moreover, in view of the previous testimony by defendant's witness Lekousi that upon hearing of the robbery that day Jewett had told him he would undoubtedly be a suspect because of his prior criminal record, we fail to see that the corroborating introduction of Jewett's remark along the same lines to Ross could materially have prejudiced him.

*Affirmed.*

COFFIN, Chief Judge (concurring).

I share the court's view that witness Lund's "uncontrolled confrontation" with appellant in the hallway and the recognition inquiry put to her by the assistant U. S. Attorney were regrettable. But, assuming good faith on the part of the prosecutor, I cannot say that this is any more prejudicial than identification in the preliminary hearing itself, where appellant's sitting next to his counsel would be equally suggestive. Yet the cases have not gone so far as to proscribe such identification.

More disturbing, because so unnecessary, is the failure here of the govern-

---

4. Ross contradicted one of the witnesses who testified it was not raining when Ross first entered the hotel after the crime, though Ross admitted he probably would not have noticed the rain if he were as busy as the witness had been. He also testified that he talked to Jewett at 3 p. m. rather than at 1, and that Jewett had left the hotel for ten minutes two hours after the robbery contrary to testimony that he had been there all day. Finally, he testified that Jewett approached him at the hotel rather than vice versa and that he had not asked to inspect Jewett's hands for evidence of red dye from a "bomb pack" placed by the bank teller with the stolen money during the robbery, though he admitted he saw no evidence of such dye.

5. "Q And what happened?
 A As we walked into the lobby, Mr. Jewett approached me and asked me what we wanted him for.

Q And what did you say?
A And I don't recall my exact words, but I think it was something like, 'Why would we want you?' And at this time he stated, 'I'd know you guys anywhere. You are with the FBI, and if you are down here, you want me', and at that time I identified myself to him as a Portland Police Officer, and I asked him his name, and he told me his name was Terrill Jewett, and I asked him again why we would want him. And, you know, he stated, 'You are with the FBI. You must want me.' And at that time I told him we didn't want him. At this time, Agent Jones and Detective Conley had gone from the lobby to the bar and were talking with Lekousi."

ment to have arranged a proper and prompt line-up for the two witnesses. Instead, it let pass two months before asking Lund to identify at the preliminary hearing and six months before resorting to a photographic spread in a distant city for Jurenas. As behavioral scientists have often demonstrated, the passage of time is an unreliable editor of remembered perception. *See* Buckhout, *Eyewitness Testimony,* 231 Scientific Amer. No. 6, at 23 (December 1974).

While the use of a "less reliable procedure where a more reliable one may be available", *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), is not fatal to the government's efforts to elicit a later in-court identification, I think it implicit in *Neil,* and in *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), that the necessity for a suggestive procedure is a factor to consider in reviewing "the totality of the circumstances". 388 U.S. at 302, 87 S.Ct. 1967. *United States v. Jackson,* 448 F.2d 963, 966 (9th Cir. 1971).