# CHARLES A. VENNER, IV *v.* STATE OF MARYLAND

[No. 39, September Term, 1976.]

*Decided January 5, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*Arnold M. Zerwitz* and *George E. Burns, Jr., Assistant Public Defenders*, with whom was *Alan H. Murrell, Public Defender*, on the brief, for appellant.

*Bernard A. Raum, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General*, and *Clarence W. Sharp, Assistant Attorney General*, on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here affirm the holding of the Court of Special Appeals in *Venner v. State*, 30 Md. App. 599, 354 A. 2d 483 (1976), that certain balloons found in the stools of appellant, Charles A. Venner, IV (Venner), were abandoned property and that Maryland Code (1957, 1971 Repl. Vol., 1976 Cum. Supp.) Art. 43B, § 10 (b) (as amended in 1971) with reference to a person who "seek[s] counselling, treatment or therapy for any form of drug abuse" in certain named circumstances is not applicable to the facts of this case.

The facts of the case were set forth in full by Judge Powers for the Court of Special Appeals. We shall relate only such facts here as are necessary to a clear understanding of the issues presented and of our opinion.

Venner was admitted to a Baltimore hospital in a semiconscious condition. The attending physician concluded upon the basis of his own observation, combined with information obtained from Venner's friends, that Venner was suffering from a narcotic overdose caused by the leakage of hashish oil from balloons in his stomach. X-ray examination revealed the presence of 12 to 15 balloons. The Baltimore City Police Department was notified. The police requested the supervisor of nurses in the intensive care area where Venner was a patient to notify them immediately if his stools contained balloons. A total of 21 balloons and a fragment of a balloon were recovered. The hospital records

reflect that the first balloons were passed about 26 hours after his admission. The remaining balloons were eliminated over a period of the next two to three days. Upon examination the balloons were found to contain hashish oil. The analyst said that "there could easily be a hundred pounds of marijuana involved" in order to extract the amount of hashish oil there shown. Venner was convicted under an information charging him with unlawfully possessing marijuana extract in sufficient quantity to reasonably indicate an intent to manufacture or distribute it. The trial judge, in imposing sentence, noted:

> "[I]t strikes me that this was obviously a commercial transaction. No doubt in my mind that you were attempting to smuggle this hashish oil in. It obviously must have cost a fairly substantial amount of money to buy it and, according to the testimony that I got at the time of the trial of the case, its value on the market was some twenty-five to thirty thousand dollars."

Venner's pretrial motion to suppress the evidence was overruled by the trial court on the dual grounds of exigent circumstances and abandoned property. The trial judge (Liss, J.) likewise concluded that Maryland Code (1957, 1971 Repl. Vol., 1976 Cum. Supp.) Art. 43B, § 10 (b) was not applicable under these facts. The Court of Special Appeals affirmed on both points. However, it did not reach the question of exigent circumstances because it determined the balloons to be abandoned property.

## Fourth Amendment

No search warrant was issued for the balloons. Accordingly, Venner contends that the seizure of the balloons is a violation of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" protected by the Fourth Amendment to the Constitution of the United States, made applicable to the states by *Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961).

In *Frank v. Maryland*, 359 U. S. 360, 363, 79 S. Ct. 804, 3 L.Ed.2d 877 (1959), Mr. Justice Frankfurter sàid that "[t]he history of the constitutional protection against official invasion of the citizen's home makes explicit the human concerns which it was meant to respect." He then went on to refer to the fact that "[i]n years prior to the Revolution leading voices in England and the Colonies protested against the ransacking by Crown officers of the homes of citizens in search of evidence of crime or of illegally imported goods" and observed that "[t]he vivid memory by the newly independent Americans of these abuses produced the Fourth Amendment as a safeguard against such arbitrary official action by officers of the new Union, as like provisions had already found their way into State Constitutions." In *Warden v. Hayden*, 387 U. S. 294, 301, 87 S. Ct. 1642, 18 L.Ed.2d 782 (1967), Mr. Justice Brennan spoke of "the history and purposes of the Amendment" as being "a reaction to the evils of the use of the general warrant in England and the writs of assistance in the Colonies, and was intended to protect against invasions of 'the sanctity of a man's home and the privacies of life,' *Boyd v. United States*, 116 U. S. 616, 630 [, 6 S. Ct. 524, 532, 29 L. Ed. 746 (1886)], from searches under indiscriminate, general authority."

A portion of the opinion of Mr. Justice Stewart for the Court in *Hoffa v. United States*, 385 U. S. 293, 87 S. Ct. 408, 17 L.Ed.2d 374 (1966), provides insight as to the intended scope of the Fourth Amendment. In that case a government informer had been placed with the defendant during a criminal trial. It was contended that the fact the informer was able to hear Hoffa's incriminating statements in a hotel suite violated Fourth Amendment rights, the argument being that the informer's failure to disclose his role as a government informer vitiated the consent given by Hoffa to the informer's repeated entries into the suite and that by listening to Hoffa's statements the informer conducted an illegal "search" for verbal evidence. Mr. Justice Stewart said for the Court:

> "The preliminary steps of this argument are on solid ground. A hotel room can clearly be the ob-

ject of Fourth Amendment protection as much as a home or an office. *United States v. Jeffers*, 342 U.S. 48. The Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area. *Gouled v. United States*, 255 U.S. 298. And the protections of the Fourth Amendment are surely not limited to tangibles, but can extend as well to oral statements. *Silverman v. United States*, 365 U.S. 505.

"Where the argument falls is in its misapprehension of the fundamental nature and scope of Fourth Amendment protection. What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile. There he is protected from unwarranted governmental intrusion. And when he puts something in his filing cabinet, in his desk drawer, or in his pocket, he has the right to know it will be secure from an unreasonable search or an unreasonable seizure. So it was that the Fourth Amendment could not tolerate the warrantless search of the hotel room in *Jeffers*, the purloining of the petitioner's private papers in *Gouled*, or the surreptitious electronic surveillance in *Silverman*." *Id*. at 301.

In his concurring opinion in *Katz v. United States*, 389 U. S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967), Mr. Justice Harlan enunciated criteria for testing the Fourth Amendment's applicability:

"As the Court's opinion states, 'the Fourth Amendment protects people, not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.' My understanding of the rule that has emerged from

prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable. Cf. *Hester v. United States,* [265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898 (1924)]." *Id.* at 361.

Venner concedes that if he can be deemed to have abandoned the waste here in question, then there has been no violation of his Fourth Amendment rights. *Hester v. United States,* 265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898 (1924). *See* discussion in 1 J. Varon, *Searches, Seizures and Immunities* 590-91 (2d ed. 1974), and J. Cook, *Constitutional Rights of the Accused — Pre-Trial Rights* § 48 (1972). The latter work warns at page 313 that *"Hester* should not be read to mean any brief relinquishment of possession or control constitutes an abandonment," citing *Rios v. United States,* 364 U. S. 253, 80 S. Ct. 1431, 4 L.Ed.2d 1688 (1960), where the Court observed that "a passenger who lets a package drop to the floor of the taxi cab in which he is riding can hardly be said to have 'abandoned' it."

Judge O'Donnell said for this Court in *Everhart v. State,* 274 Md. 459, 337 A. 2d 100 (1975):

"[W]hether property is abandoned is generally a question of fact based upon evidence of a combination of act and intent. *See Parman v. United States,* 399 F. 2d 559 (D.C. Cir.) (Burger, J.), *cert. denied,* 393 U. S. 858 (1968)." *Id.* at 483.

A test for abandonment is set forth in *United States v. Wilson*, 472 F. 2d 901 (9th Cir. 1972), *cert. denied*, 414 U. S. 868 (1973):

> "The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned. Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). As Mr. Justice Frankfurter stated in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960):
>
>> ' * * * We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical * * *.' 362 U.S. at 266, 80 S.Ct. at 733.
>
> "Wilson urges that the rejection of Fourth Amendment distinctions based on property rights is a one-way street: that is, ancient rules of tenure and transfer of property may be rejected to increase, but never to decrease, Fourth Amendment protections. It is more accurate to look to the purpose of the Fourth Amendment. Privacy, rather than hereditaments, has motivated the recent decisions. Cases like *Jones* and *Katz* encourage a functional approach to the Fourth Amendment. The objective is protection of a justifiable expectation of privacy and freedom from governmental intrusion." *Id.* at 902-03.

*Venner* particularly relies on *People v. Krivda*, 5 Cal. 3d 357, 486 P. 2d 1262, 96 Cal. Rptr. 62 (1971), *vacated and*

*remanded,* 409 U. S. 33 (1972), *affirmed on same grounds,* 8 Cal. 3d 623, 504 P. 2d 457, 105 Cal. Rptr. 521, *cert. denied,* 412 U. S. 919 (1973). As the Court put the question there it was "whether a householder who places contraband in trash barrels and subsequently places the barrels adjacent to the street for pickup by the rubbish collector may be deemed to have abandoned the trash at that location and to have forsaken any reasonable expectation of privacy with respect thereto." Police officers were investigating a tip from an anonymous informant that certain individuals were engaged at a particular address in sex and narcotics activities and were injecting two children with methedrine. After verifying through a utility check the fact that one of the persons said to be engaged in such activities paid the utilities there and that a man whose wife's name corresponded to the information furnished had previously been arrested for narcotic activity, the police officers returned to the address where they saw several trash barrels in front of the home adjacent to the sidewalk. They observed refuse collectors approaching. They stopped them about a half a block away, identified themselves, and requested them to empty the well of their trash truck and to pick up the trash in the cans in front of the address. The contraband was concealed in paper sacks within the barrels and was not visible without emptying or searching through the barrel's contents. The court said that "[u]nder such circumstances, . . . defendants had a reasonable expectation that their trash would not be rummaged through and picked over by police officers acting without a search warrant." It relied on its earlier decision in *People v. Edwards,* 71 Cal. 2d 1096, 458 P. 2d 713, 80 Cal. Rptr. 633 (1969). There a defendant's "reasonable expectation of privacy was [held] violated by unreasonable governmental intrusion." The court said:

> "In the light of the above authorities, we are sat-
> isfied that the search of the trash can was unlaw-
> ful. As we have seen, the trash can was within a
> few feet of the back door of defendants' home
> and required trespass for its inspection. It was an
> adjunct to the domestic economy. (See Work v.

United States, 100 U.S. App. D. C. 237, 243 F.2d 660, 662.) Placing the marijuana in the trash can, so situated and used, was not an abandonment unless as to persons authorized to remove the receptacle's contents, such as trashmen. (See Work v. United States, *supra*, at pp. 662-663.) The marijuana itself was not visible without 'rummaging' in the receptacle. So far as appears defendants alone resided at the house. In the light of the combined facts and circumstances it appears that defendants exhibited an expectation of privacy, and we believe that expectation was reasonable under the circumstances of the case. We can readily ascribe many reasons why residents would not want their castaway clothing, letters, medicine bottles or other telltale refuse and trash to be examined by neighbors or others, at least not until the trash has lost its identity and meaning by becoming part of a large conglomeration of trash elsewhere. Half truths leading to rumor and gossip may readily flow from an attempt to 'read' the contents of another's trash." *Id.* 458 P. 2d at 718.

In *United States v. Mustone*, 469 F. 2d 970 (1st Cir. 1972), a person was seen to place two large trash bags near some garbage cans "several doors away" from a house under surveillance by Secret Service agents. The bags were tied closed when picked up by the agents. They contained evidence of counterfeiting. The defendants there relied on *Krivda*. The court said:

"There the court upheld the suppression of evidence obtained during the warrantless search of the can. We are not persuaded by this authority, however, and hold that when Brennan deposited the bags on the sidewalk he abandoned them. Implicit in the concept of abandonment is a renunciation of any 'reasonable' expectation of privacy in the property abandoned. The contrary suggestion strikes us as anomalous. *See* United

States v. Dzialak, 441 F.2d 212, 215 (2d Cir.), cert. denied, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971); United States v. Stroble, 431 F.2d 1273, 1276 (6th Cir. 1970); United States v. Minker, 312 F.2d 632, 634-635 (3d Cir. 1962), cert. denied, 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963)." *Id.* at 972-73.

*Krivda* has also been rejected in *State v. Fassler*, 108 Ariz. 586, 503 P. 2d 807, 813-14 (1972), and *People v. Huddleston*, 38 Ill. App. 3d 277, 347 N.E.2d 76, 79 (3d Dist. 1976).

Other cases with holdings similar to that in *Mustone* include *United States v. Jackson*, 448 F. 2d 963, 971 (9th Cir. 1971); *United States v. Dzialak*, 441 F. 2d 212, 215 (2d Cir.), *cert. denied*, 404 U. S. 883 (1971); *United States v. Stroble*, 431 F. 2d 1273, 1276 (6th Cir. 1970); *Smith v. State*, 510 P. 2d 793, 797 (Alas.), *cert. denied*, 414 U. S. 1086 (1973); and *State v. Purvis*, 249 Ore. 404, 438 P. 2d 1002, 1005 (1968).

Both *Smith* and *Huddleston* referred to the test enunciated by Mr. Justice Harlan in his concurring opinion in *Katz*. In *Smith* police removed plastic garbage bags seen by them to have been deposited by the defendant in a dumpster located outside the apartment building in which she resided. The court said that "[t]he question presented . . . [was] how to determine whether a reasonable expectation of privacy exist[ed t]here." It said its "touchstone [was] Justice Harlan's separate concurrence in *Katz*," which we have already quoted, whether a person has exhibited an actual (subjective) expectation of privacy and whether the expectation is one society is prepared to recognize as "reasonable." The Alaska court found that neither test was met. It said that if it were to assume arguendo that there was a subjective expectation of privacy, the "court [was] unable to hold that 'society is prepared to recognize [such an expectation] as "reasonable," ' at least in the case at bar." In *Huddleston* the court said with reference to two plastic trash bags sitting at the curb of the street removed by an officer that the defendant had no reasonable expectation of privacy in the trash; "[t]here [was] no evidence that [he] exhibited

an actual expectation of privacy, but even if he had, [it] d[id] not believe that such an expectation [was] 'one that society is prepared to recognize as "reasonable," ' " adopting the concurring opinion of Mr. Justice Harlan in *Katz.*

In *Everhart* we found *Edwards,* upon which *Krivda* relied, "particularly applicable . . . ." In *Everhart* police opened "trash bags . . . all piled in a heap" at the side of a house. We directed that on the remand "the trial court [should] make a finding . . . as to whether or not the search and seizure of the plastic bag was within the protection of the petitioner's rights under the Fourth Amendment." The facts of this case differ greatly from those in *Everhart, Krivda,* and *Edwards.* We have here no intrusion into or about Venner's place of abode. *Cf. State v. Smith,* 12 Wash. App. 720, 531 P. 2d 843 (1975), where, relative to a warrantless search and seizure of an individual's clothes placed in an anteroom outside his hospital room, the court "h[e]ld that the items seized were properly admitted because the search was consented to by the hospital which had joint control of them," pointing out that "[f]or all he knew they were being taken to a place in the hospital far from his room and open to anyone."

We find persuasive here *United States v. Cox,* 428 F. 2d 683 (7th Cir. 1970), a case that comes closest factually to the case at bar of any which we have examined. There, hair samples were obtained and analyzed by the Federal Bureau of Investigation. The samples were procured as the result of a haircut given Cox while he was in jail. The court stated that "haircuts [were] regularly given inmates by prison officials in connection with the regulation of the personal hygiene of prisoners" and that the "record d[id] not show that Cox's haircut was not an ordinary barbering incident." In finding this to be abandoned property it said:

> "Cox, however, never indicated any desire or intention to retain possession of the hair after it had been scissored from his head. Clippings such as those preserved in the instant case are ordinarily abandoned after being cut. Cox in fact left his hair

and has never claimed otherwise. The deputy sheriff was not obliged to inform him that, if abandoned, his hair would be taken and analyzed. Having voluntarily abandoned his property, in this case his hair, Cox may not object to its appropriation by the Government. Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668; United States v. Minker, 312 F.2d 632, 634-635 (3d Cir. 1962), certiorari denied, 372 U. S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978; United States v. Cowan, 396 F.2d 83, 86-87 (2d Cir. 1968); Parman v. United States, 130 U.S. App. D.C. 188, 399 F.2d 559, 564-565 (D.C. Cir. 1968), certiorari denied, 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126. Defendant's intent in discarding his severed hair is no less clear because it involved no affirmative act on his part. United States v. Cowan, 396 F.2d 83, 87 (2d Cir. 1968); Friedman v. United States, 347 F.2d 697, 701-706 (8th Cir. 1965), certiorari denied, 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354; Feguer v. United States, 302 F.2d 214, 249 (8th Cir. 1962), certiorari denied, 371 U. S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110." *Id.* at 687-88.

Nearly all of the facts in this case were stipulated in the trial court. No testimony was adduced from Venner or any hospital personnel. From the hospital record, which was introduced into evidence, we draw the inference that Venner was lucid. We have no indication of any effort on the part of Venner to protest the removal of his excreta. Venner would have been a naive young man had he in entering the hospital not expected that his human waste would be examined. Urinalysis, blood tests, and examination of one's stools are part of normal hospital procedures. Moreover, the very fact that the issue is here indicates that the elimination of Venner's waste was into a bedpan rather than a water closet. Inevitably in the normal course of hospital procedure it was necessary for someone to remove the bedpan with that waste in it. Thus, the same privacy did not exist as would have existed in a lavatory in Venner's own home. We have here no

issue of trespass upon the premises of Venner to obtain this waste as in *Edwards* and *Everhart.* Of one thing we can be certain and that is that the examination of Venner's stools here was not comparable to the feared examination of "castaway clothing, letters, medicine bottles or other telltale refuse and trash" mentioned in *Edwards* which that court believed could reveal "[h]alf truths leading to rumor and gossip . . . ." There was no ransacking. Utilizing the criteria of Mr. Justice Harlan, we are of the view that Venner could not have had an "expectation . . . that society [would be] prepared to recognize as 'reasonable' " a property right in human excreta for the simple reason that human experience is to abandon it immediately.

## The Statute

Art. 43B, § 10 (b), the statute in question, provides:

"Whenever a person shall seek counselling, treatment or therapy for any form of drug abuse from a physician, psychologist, hospital, an educator pursuant to the provisions of § 85A of Article 77, or a person, program or facility authorized by the Authority to counsel or treat any form of drug abuse, no statement, whether oral or written, made by such person and no observation or conclusion derived from such counselling, treatment or therapy made by such physician, psychologist, hospital, person, program or facility shall be admissible against such person in any proceeding. The facts or results of any examination to determine the existence of illegal or prohibited drugs in a person's body shall not be admissible in any proceeding against such person, provided that the facts or results of any such examination ordered pursuant to a civil commitment proceeding under this article or as a condition of parole or probation shall be admissible in the proceeding for which the examination was ordered."

Art. 43B was enacted by Chap. 404 of the Acts of 1969. It stated in its title that it was intended "to combat the effects of all forms of drug abuse through a statewide program of education, treatment and rehabilitation . . . ." A declaration of purpose is embodied in § 1 "based in part upon the report of the Maryland Commission to Study the Problems of Drug Addiction . . . ." It speaks of "human suffering and social and economic loss caused by all forms of drug abuse [as] matters of grave concern to the people of the State." It refers to "[t]he magnitude of the cost to the people of the State for police, judicial, penal and medical care purposes, directly and indirectly caused by drug abuse . . . ." It refers to "[a] comprehensive program of compulsory treatment of drug addicts [as being] essential to the protection and promotion of the health and welfare of the inhabitants of the State," noting that "[d]rug addicts are estimated to be responsible for one-half the crimes committed in the City of Baltimore alone and the problem of drug addiction is rapidly spreading into the suburbs and other parts of the State," such being a "threat to the peace and safety of the inhabitants of the State . . . ." It observed that "[t]he drug addict needs help before he is compelled to resort to crime to support his habit" and that "[t]he drug addict who commits a crime needs help to break his addiction." It states flatly, "The comprehensive program provided by this Article is designed to assist the rehabilitation of drug addicts." Definitions are found in § 2 where "drug abuse" (the only defined term appearing in § 10 (b)) is said to be "misuse by any person of or dependence by any person on" certain drugs of which hashish oil would be one. When to this is added the definitions of "drug addiction" as "a physical and psychological dependence on" such drugs and "drug addict" as "a person exhibiting the symptoms of drug addiction or who by reason of the repeated use of any drug enumerated [in the definitions] is in imminent danger of becoming addicted to that drug" it is seen that the focus is on the drug addict. It is in that context that § 10 (b) was enacted to protect an individual who might seek help for his addiction. We have here no addict seeking treatment in order that he

may rehabilitate himself, but an obvious distributor or transporter in the possession of thousands of dollars worth of a controlled dangerous substance who got caught. Whether he swallowed the balloons to avoid detection because he thought he was about to be apprehended and one then accidentally burst or whether he intended to smuggle the hashish oil in by the use of the human body, we do not know. It was not as an addict that Venner sought treatment. We find nothing to indicate that this act was intended to protect an individual who was neither an addict nor one using the drug in question, but an obvious distributor or transporter. Accordingly, the trial judge did not err when he concluded that the statute did not afford Venner protection in the facts and circumstances here present.

*Judgment affirmed; appellant to pay the costs.*