# CHARLES VENNER *v.* STATE OF MARYLAND

[No. 166, September Term, 1975.]

*Decided March 26, 1976.*

The cause was argued before POWERS, DAVIDSON and MOORE, JJ.

*Arnold M. Zerwitz, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender, George E. Burns, Jr., Assistant Public Defender* and *Aldridge L. Lees, Assigned Public Defender* on the brief, for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City* and *H. Gary Bass, Assistant State's Attorney for Baltimore City* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

May the State obtain evidence in a narcotics case from the excrement of a hospital patient, without a warrant, and use that evidence against the patient in a criminal trial?

This question was posed by a motion filed in the Criminal Court of Baltimore by Charles Venner. A two count information charged Venner with unlawfully possessing marihuana extract in sufficient quantity to indicate an intent to manufacture or distribute it, and with simple possession of the same substance. He moved to suppress the evidence and dismiss the information.

Both the issue raised by the motion, as well as the ultimate issue of guilt or innocence, were submitted to Judge Solomon Liss, without a jury, in a series of appearances from 12 December 1973 to 20 November 1974. Evidence which it was stipulated that the court should consider on both issues consisted of an agreed statement of facts, supplemented by testimony and exhibits. Judge Liss denied the motion and found Venner guilty on the first count. After sentence was imposed, Venner appealed.

### The Facts Before The Court

The agreed statement was submitted on 27 September 1974. The transcript reads:

"THE COURT: All right, Mr. Bass [Assistant State's Attorney], will you please give us the facts that are agreed on in this case?

Now as I understand it, Mr. Gede, these facts are stipulated and agreed and are to be accepted by the Court as if they had been introduced into evidence by the witnesses. Any facts that are not agreed on you will, of course, promptly let the Court know?

MR. GEDE [Defense counsel]: Yes.

THE COURT: Very well.

MR. BASS: Your Honor, on July 21, 1973, at 3:45 P.M., Charles Venner, a twenty year old male, was taken to Sinai Hospital in Baltimore, Maryland by several friends. The defendant was admitted to the emergency room in what appeared to be a semi-conscious state. The friends gave certain information to the attending physician, Dr. Robert Egbert of the Sinai Hospital Staff, and based on this information Dr. Egbert had reason to believe that perhaps the defendant had taken in his stomach, contained in balloons a substance known as hashish oil; and he also, on the basis of looking at the patient, believed that either one of the many balloons had burst inside the defendant, thus an overdose.

The doctor ordered x-rays taken by the hospital radiologist, and these photographs revealed 12 to 15 balloons still inside the defendant's stomach."

\* \* \*

"MR. BASS: As I said, the x-rays revealed what looked like 12 to 15 balloons still inside the defendant's stomach. Dr. Egbert then notified the Baltimore City Police Department, and Officer Russell Smeak of Northwest District. Officer Smeak, after hearing the situation, made arrangements with the Supervisor of Nurses, Intensive Care, if any stools contained balloons the hospital was told to contact Northern District, and they would respond and take custody of the contents.

On July 22, 1973, at 8:10 P.M., Officer Michael

Leonard of the Northwestern District responded to a call of the hospital and took custody of 8 balloons. On July 23, 1973, Officer Wendell France responded to a call to the hospital and received 4 balloons. At approximately 6:30 Officer Allen Taylor went to the hospital to retrieve one more balloon passed by the defendant. On July 24, 1973, about 11:00 A.M., Officer Joseph Lombardi responded to the hospital call to receive eight more balloons found in the defendant's stool. A total of 21 balloons were recovered, plus a fragment of a broken balloon."

\* \* \*

"THE COURT: Is it further stipulated between counsel that the balloons that were turned over to Officer Leonard, Officer France, Officer Taylor, and Officer Lombardi were, in fact, retrieved from the stools that were passed by the defendant in the hospital?

MR. GEDE: Yes, sir.

THE COURT: Very well. Now that still leaves, obviously, the open question as to whether or not the nurse was entitled — the nurses were entitled to take these stools and to examine them, and whether the police officers were entitled to receive them without a search and seizure warrant.

MR. BASS: Chemist William Butler of the Baltimore City Police Department analyzed the contents of the rubber balloons and obtained a positive test for hashish oil.

Your Honor, that is as far as we can go with the statement of facts.

MR. GEDE: Your Honor, just for the record, I will stipulate that that is what he would say without seeing the chemist's report and analysis of it."

\* \* \*

"THE COURT: I think what you ought to do is

bring your expert in. This is an essential part of the case. There's a question of whether he should be held for possession or distribution, and I think that we ought to have testimony on this. I suggest to you, when we meet again two weeks from today, that the expert be here so we can qualify him and have him bring his report in and have him give us the benefit of any expertise as to what this means from the standpoint of dosage as well as from the standpoint of quantity."

There followed a discussion among the judge and counsel as to additional evidence. Judge Liss set a time for taking further evidence. At a later hearing the State called a qualified chemist, who testified that he had received the balloons and examined their contents. They contained what the chemist referred to as hashish oil, or marihuana extract, the principal agent extracted being tetrahydrocannabinol. The quantity of the extract was 200 grams, which the witness said could easily involve a hundred pounds of marihuana. He said that that much extract could be used to produce a hallucinogenic effect in thousands of cigarettes.

The record of Venner's admission and treatment at Sinai Hospital, in Baltimore, which was before Judge Liss and is a part of the record before us, provides more detail than was included in the agreed statement. The hospital summary shows, as the history of the present illness:

"Patient has been in apparent good health without any significant medical history. Three months ago, he went to Morocco for a vacation and on returning home he was caught with illegal possesion of narcotics (name ? unknown). He was jailed for three months, and was released a few days prior to admission. Before boarding the plane, he allegedly swallowed 24 to 25 bags of hashish oil and on that night he became dizzy, weak, nauseated, with dry mouth. He arrived at New York Kennedy Airport and passed 5 balloons the next day. The night prior to admission he developed

nausea, hallucinations, increased appetite, drowsiness, and disorientation. His condition remained the same and he was brought to the Sinai Hospital Emergency Room the next day, euphoric, disoriented and lethargic, but responding to verbal orders."

The summary contains this description of "Hospital Course":

"Patient was admitted to Mt. Pleasant ICU, and on the 2nd hospital day, he was coherent, and oriented x3. He was noticed to be persistently bradycardeic, which did not respond to Atropine. At 5:40 p.m., on that day, he passed through the rectum 8 balloons of different colors. Another five balloons were passed on the next day, then four balloons on the 4th day and two balloons on the 5th day. Vital signs remained stable in spite of the bradycardia, ranging between 34 to 60/min. Serial abdominal films revealed the presence of numerous foreign bodies, and the last film taken the day before discharge disclosed no evidence of such foreign body. Police report on the contents of one of the balloons was positive for marihjuana [sic]."

Progress notes in the hospital record contain these entries:

"7/22 6 pm Passed at 5 $\frac{40}{\text{pm}}$ 8 bags (balloons) of diff colors — yellow, green, blue. They were given to the nursing supervisor at once. 11 more bags to go (if count is correct)."

"7-23 He passed 5 balloons more."

"7/24 passed 4 balloons (intact) plus a small fragment. Total = 8 + 5 + 4 = 17. (2 more if count is correct & if all are intact, however, apparently at least one got burst)."

"7/25 12N passed 2 more balloons at 3 $\frac{30}{\text{pm}}$ yesterday. Everything accounted for, however, on further questioning, he says that he could not remember if they were really 24 or 25."

On the Doctors Order Sheet an entry at 1:00 A.M. on 22 July 1973 says, "Foreign bodies in stools to be handed over to security." Relevant entries in Nurses Notes are:

"7-22 5 40/pm Had large stool including 8 colored articles which were removed and given to Dr. Uy.

6 P.M. Miss Keithly given the foreign bodies taken from stool. Dr. Uy gave them to Miss Keithly."

"7-23 10 45/AM Passed large brown formed stool $\bar{c}$ [with] 5 balloons."

"7-24 9 10/AM Had large formed bowel movement & passed four balloons.

3 30/PM Passed 2 more balloons $\bar{c}$ loose bowel movement. Balloons kept — locked security. To be analyzed."

## Contentions on Appeal

The questions in this appeal, as appellant presents them in his brief, are:

1. Did the trial court err in admitting evidence obtained as a result of Appellant's medical treatment for drug abuse?

2. Was there sufficient probable cause to justify a warrantless search and seizure?

3. Did the State show sufficient exigent circumstances to justify a warrantless search and seizure?

Numbers 2 and 3 could well be combined and restated: Was the contraband lawfully obtained by the police?

## Statutory Protection Against Disclosure

Appellant's first contention invokes the protection of Code, Art. 43B, § 10 (b), which says:

"Whenever a person shall seek counselling, treatment or therapy for any form of drug abuse

from a physician, psychologist, hospital, an educator pursuant to the provisions of § 85A of Article 77, or a person, program or facility authorized by the Authority to counsel or treat any form of drug abuse, no statement, whether oral or written, made by such person and no observation or conclusion derived from such counselling, treatment or therapy made by such physician, psychologist, hospital, person, program or facility shall be admissible against such person in any proceeding. The facts or results of any examination to determine the existence of illegal or prohibited drugs in a person's body shall not be admissible in any proceeding against such person, provided that the facts or results of any such examination ordered pursuant to a civil commitment proceeding under this article or as a condition of parole or probation shall be admissible in the proceeding for which the examination was ordered."

Pointing out that the statute, Art. 43B, § 2 (d) defines drug abuse as including "any misuse by any person of * * * any drug whose use is either prohibited or regulated", appellant argues that § 10 (b) makes inadmissible against him any evidence from the hospital or its personnel or records. The same argument was made below. In an excellent opinion filed with his ruling on the motion to suppress, Judge Liss held that Venner was not entitled to the protection of the statute. We adopt that portion of Judge Liss's opinion. He said:

"Defendant urges that he is entitled to the protection of this section of the Drug Abuse Control and Rehabilitation Act (Article 43B); and that therefore the evidence obtained by reason of his examinations and treatment at Sinai Hospital is inadmissible. The State concedes that if this evidence is suppressed the case against the Defendant must fall. It therefore becomes necessary for the Court to determine whether it

was the intent of the Maryland Legislature to afford the Defendant, under the circumstances of this case, the protection mandated by Article 43B.

"Article 43B begins with a Declaration of Purpose which states the legislative intent for the passage of the Act. Section (c) of that Declaration of Purpose is as follows:

> 'Experience has demonstrated that drug addicts can be rehabilitated and returned to useful lives only through extended periods of treatment in a controlled environment followed by supervision in an after-care program. The purpose of this article is to provide a comprehensive program of human renewal of drug addicts in rehabilitation centers and after-care programs. *The comprehensive program provided by this article is designed to assist the rehabilitation of drug addicts.* It applies to addicts who are not accused of crimes, as well as addicts convicted of crimes. *The program is further designed to protect society against the social contagion of drug addiction and to meet the need of drug addicts for medical, psychological and vocational rehabilitation, while safeguarding the liberty of individuals against undue interference.'* (1969, Ch. 404) [Italics supplied]

"Delegate Steven V. Sklar, of the Maryland Legislature, the sponsor of Article 43B, was called as joint witness by the State and by the Defense. Delegate Sklar indicated that it was his view that the legislative intent was to prevent the use of evidence in a court proceeding against a drug abuser or drug user where this evidence was obtained by reason of the drug user's or abuser's seeking counseling, treatment or therapy from a physician, psychologist, hospital, or educator.

"Article 43B, Section 2, included the following definitions:

'(D) "Drug abuse" means any misuse by any person of or dependence by any person on any drug whose use is either prohibited or regulated by 276 through 302 of Article 27, including, but not limited to, narcotic and non-narcotic drug addiction and narcotic and non-narcotic drug habituation.

'(E) "Drug Addiction" means a physical and psychological dependence on any drug enumerated in 276 through 302 of Article 27.

"Drug Addict" means a person exhibiting the symptoms of drug addiction or who, by reason of the repeated use of any drug enumerated above is in imminent danger of becoming addicted to that drug; provided, however, that no person shall be deemed a drug addict solely by virtue of his taking of any such drug pursuant to a lawful prescription issued by a physician in the course of professional treatment for legitimate medical purposes.'

"It would seem clear that the purpose of this Act was to aid in the treatment, counseling and rehabilitation of drug abusers and drug addicts. A reading of the declaration of purpose, the definitions, and Section 10 leads to the inescapable conclusion that the Legislature was seeking to encourage those unfortunates to seek treatment and not to be deterred from requesting such treatment and assistance because of the fact that the information obtained by the physician or hospital might be used in a criminal prosecution against the patient.

"The Defendant, however, has not shown that he is entitled to the benefits accruing from Section 10 of Article 43B. There is not a scintilla of evidence that he was either a drug abuser or drug addict.

While it is obvious that the Defendant introduced a large quantity of hashish oil in his body, it is clear that this was not done for the purpose of achieving the psychotrophic response sought by a drug abuser. Instead, the Defendant very carefully devised an ingenious scheme to prevent the drug from entering his blood stream. The sole purpose was to assist the Defendant in secreting the contraband drug so that he might avoid discovery. The magnitude of the amount involved indicated an intention to manufacture or distribute the drug. His scheme might have succeeded except for the fortuitous circumstance that one of the balloons burst and he suffered the effects of a hashish overdose. The Court draws the conclusion from all the facts that the swallowing of the balloons was for the purpose of evading discovery of the contraband which was to be distributed illegally by the Defendant for a profit.

"Article 43B, Section 10, was never intended to assist the drug trafficker to engage in his nefarious trade and to use its provisions as a shield against apprehension and punishment.

"For the reasons given, the Court holds that the Defendant is not entitled to the protection afforded by Article 43B, Section 10."

### Fourth Amendment Protection Against Unreasonable Search and Seizure

The other issue, as Judge Liss stated it in his Memorandum Opinion below, was:

"The second issue to be decided by this Court is whether the evidence seized by the police without a warrant from Sinai Hospital should be excluded from the case because its seizure was a violation of the Fourth Amendment of the Constitution of the United States * * *."

Appellant's questions 2 and 3 as he states them here, are directed to specific findings by Judge Liss under that issue.

That part of the Fourth Amendment which is invoked provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *."

Judge Liss cited and discussed numerous decisions of the United States Supreme Court, including *Rochin v. California*, 342 U. S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952); *Schmerber v. California*, 384 U. S. 757, 16 L.Ed.2d 908, 86 S. Ct. 1826 (1966); *Chambers v. Maroney*, 399 U. S. 42, 26 L.Ed.2d 419, 90 S. Ct. 1975 (1970); *Cupp v. Murphy*, 412 U. S. 291, 36 L.Ed.2d 900, 93 S. Ct. 2000 (1973). He proceeded to examine the factual situation in this case and held that there was probable cause, that the circumstances were exigent, and that the warrantless seizure was reasonable and did not violate Venner's rights under the Fourth Amendment. For these reasons he denied the motion to suppress the contraband as evidence and to dismiss the information against Venner.

We reach the same result, but we do not find it necessary to consider the questions of probable cause, exigency, or reasonableness. Those are considerations which must be weighed when a court undertakes to determine whether questioned evidence, seized by police from a defendant on trial, was seized in compliance with or in violation of conceded Fourth Amendment rights of that defendant. Before it is necessary to entertain the question of compliance on the one hand and violation on the other, there may be, as there is in this case, a threshold question to be answered. That question is whether the Fourth Amendment *applies at all* to the circumstances under which the police came into possession of the questioned evidence.[1] If the

---

1. Another threshold question, with which we are not concerned here, is standing to object, as in Jones v. United States, 362 U. S. 257, 4 L.Ed.2d 697, 80 S. Ct. 725 (1960); Simmons v. United States, 390 U. S. 377, 19 L.Ed.2d 1247, 88 S. Ct. 967 (1968); Brown v. United States, 411 U. S. 223, 36 L.Ed.2d 208, 93 S. Ct. 1565 (1973). See also Duncan v. State, 276 Md. 715, 351 A. 2d

Fourth Amendment does not apply — if Venner was not the "victim" of a police seizure — then questions of probable cause, exigency, and reasonableness are totally irrelevant. The well known comment of Mr. Justice Holmes in *Hester v. United States*, 265 U. S. 57, 68 L. Ed. 898, 44 S. Ct. 445 (1924) that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields", serves to illustrate that agents of the government may, irrespective of probable cause or the lack of it, search an unprotected place and seize anything they find there, with no requirement whatever that they obtain a warrant or that there be exigent circumstances which required the immediate seizure without a warrant.

What must be kept in mind is that what the Fourth Amendment protects is the right of people to be secure against unreasonable searches and seizures. When a search and seizure are made in the proper execution of a properly issued warrant, they are not unreasonable and therefore they violate no constitutionally protected rights. To put it another way, there is no constitutional protection against a reasonable search and seizure. And not everything is protected against unreasonable searches and seizures. What is protected is the right to be secure in one's person, house, papers, and effects.

What may be suppressed, upon a proper showing, are not persons or houses themselves, but papers and effects, broadened in meaning to include any so-called real evidence or physical evidence, including intercepted conversations, but distinguished from testimonial evidence, which has been

144 (1976); Garrison v. State, 28 Md. App. 257, 345 A. 2d 86 (1975); Shope v. State, 18 Md. App. 472, 307 A. 2d 730 (1973); Lopata v. State, 18 Md. App. 451, 307 A. 2d 721, cert. denied, 269 Md. 762 (1973); Palmer v. State, 14 Md. App. 159, 286 A. 2d 572 (1972); D. Trager and E. Lobenfeld, The Law of Standing Under the Fourth Amendment, 41 Brooklyn L. Rev. 421. Yet another threshold question could be consent. See United States v. Watson, 423 U. S. 411, 46 L.Ed.2d 598, 96 S. Ct. 820 (1976); Schneckloth v. Bustamonte, 412 U. S. 218, 36 L.Ed.2d 854, 93 S. Ct. 2041 (1973); Johnson v. State, 30 Md. App. 280, 352 A. 2d 349 (1976); Wilson v. State, 30 Md. App. 242, 357 A. 2d 437 (1976); Whitman v. State, 25 Md. App. 428, 336 A. 2d 515 (1975).

unlawfully seized by the police from a person or from his house or other place where the individual has a constitutionally protected expectation of privacy.

In the familiar constitutional sense of the word "search" and the word "seizure", it is neither a search nor a seizure when the police come into possession of contraband, instrumentalities of crime, fruits of crime, or mere evidence, without violating the security of the defendant's person or his house or other constitutionally protected area.

A review of the evolution of Fourth Amendment protection available to defendants in State criminal cases may be helpful to an understanding of that protection as it is applied today. The rule followed for many years in Maryland, and in many other states, is found in *Marshall v. State*, 182 Md. 379, 35 A. 2d 115 (1943). The Court said, at 383:

> "At common law matter pertinent to the issue was always admissible and the court would not raise an issue as to how it was obtained."

The Court quoted with approval from *Lawrence v. State*, 103 Md. 17, 63 A. 96 (1906), which cited 4 *Wigmore on Evidence*, Sec. 2264, and 1 *Greenleaf on Evidence*, Sec. 254 (a), and quoted from *Greenleaf* that "though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The court will not take notice of how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question."

This view was reaffirmed by the Court of Appeals in *Davis v. State*, 189 Md. 640, 57 A. 2d 289 (1948), in which the Court said, at 645:

> "This State has aligned itself with those jurisdictions holding that the question of how evidence is obtained is collateral to the issue of the guilt or innocence of the accused, and, therefore,

pertinent evidence, no matter how obtained, will be admitted."

It should be noted that the rule applied as the law of Maryland in the cases just cited was the common law rule. A statutory modification enacted in 1929 made inadmissible in most misdemeanor trials evidence obtained through an illegal search or seizure. The common law rule continued to apply in felony cases. That statute, known as the Bouse Act, appeared as Code, Art. 35, § 5, until 1 January 1974, when it was repealed by Acts of 1973, 1st Sp. Sess., ch. 2, § 2.

When *Mapp v. Ohio*, 367 U. S. 643, 6 L.Ed.2d 1081, 81 S. Ct. 1684 (1961), extended the federal exclusionary rule of *Weeks v. United States*, 232 U. S. 383, 58 L. Ed. 652, 34 S. Ct. 341 (1914), to state prosecutions, defendants in all criminal prosecutions, felony or misdemeanor, became entitled, as a matter of federal law, to the exclusion from the trial of all evidence obtained in violation of the Fourth Amendment.

But one must have been a "person aggrieved" — he must have been the victim of an unlawful seizure — to be entitled to the protection of *Mapp's* exclusionary rule.

In *Katz v. United States*, 389 U. S. 347, 19 L.Ed.2d 576, 88 S. Ct. 507 (1967), the accused sought to suppress a telephone conversation seized by agents by the placing of an electronic device on the outside of a telephone booth in which Katz originated a call. The issues as argued were whether a public telephone booth was a constitutionally protected area, and whether a physical penetration into a constitutionally protected area is necessary to make the search unlawful. The Supreme Court declined to adopt that formulation of the issues. It said, at 350:

"In the first place, the correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase 'constitutionally protected area.' Secondly, the Fourth Amendment cannot be translated into a general constitutional 'right to privacy.' "

The Court went on to say, at 351:

"For the Fourth Amendment protects people, not

places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See Lewis v. United States, 385 U. S. 206, 210[, 87 S. Ct. 424, 427, 17 L.Ed.2d 312]; United States v. Lee, 274 U. S. 559, 563[, 47 S. Ct. 746, 748, 71 L. Ed. 1202]. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."

Answering the contention that Katz was not in a private place because he could be seen in the booth through the glass the Court said, at 352:

"But what he sought to exclude when he entered the booth was not the intruding eye — it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen. No less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world."

Not all of the cases in this area undertake to draw a clear distinction between two approaches which we see as different, and which may or may not, in a particular case, be significant to the result. It is one thing to hold that evidence may be used because the manner in which the police came by it was unrelated to any right of the accused under the Fourth Amendment. It is quite different to hold that evidence may be used because the police respected the accused's Fourth Amendment rights and the seizure was reasonable, having been made under a valid warrant, or upon probable cause and exigent circumstances.

*Cardwell v. Lewis,* 417 U. S. 583, 41 L.Ed.2d 325, 94 S. Ct. 2464 (1974), seems to illustrate this lack of distinction. An

Ohio murder victim had been found near his car, which had been pushed over an embankment. Police took scrapings of foreign paint from the car, and made casts of tire tracks found at the scene. Almost three months later the police, having developed probable cause to charge Lewis, asked him to come to the police office for interrogation. They obtained an arrest warrant before he arrived. After Lewis had been there some seven hours, the police served the arrest warrant. They took possession of his car from a public parking lot, and the next day examined the tire treads and took paint samples. Both were later connected to the murder scene. The police had no warrant to search the car.

After his conviction in a state court, Lewis obtained habeas corpus relief in the U. S. District Court, which held that the warrantless seizure of evidence from the car violated Lewis's Fourth and Fourteenth Amendment rights. The U. S. Court of Appeals affirmed.

The Supreme Court reversed, by a judgment announced in an opinion by Mr. Justice Blackmun, in which three other justices joined. Mr. Justice Powell concurred in the result. Justices Stewart, Douglas, Brennan, and Marshall dissented. The opinion by Mr. Justice Blackmun said, at 591:

> " * * * the exercise of a desire to be mobile does not, of course, waive one's right to be free of unreasonable government intrusion. But insofar as Fourth Amendment protection extends to a motor vehicle, it is the right to privacy that is the touchstone of our inquiry.
>
> "In the present case, nothing from the interior of the car and no personal effects, which the Fourth Amendment traditionally has been deemed to protect, were searched or seized and introduced in evidence. With the 'search' limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed. Stated simply, the invasion of privacy, 'if it can be said to

exist, is abstract and theoretical.' Air Pollution Variance Board v. Western Alfalfa Corp., 416 U. S. 861, 865, [94 S. Ct. 2114, 2116, 40 L.Ed.2d 607] (1974). Under circumstances such as these, where probable cause exists, a warrantless examination of the exterior of a car is not unreasonable under the Fourth and Fourteenth Amendments."

The comment appears to mix two ingredients which clarity suggests should be kept separate.[2] If indeed no expectation of privacy was infringed, then probable cause and the reasonableness of the warrantless search are irrelevancies. We point this out to emphasize that if the Fourth Amendment is not applicable, we need not look for compliance. If the Fourth Amendment is applicable, compliance is, of course, mandatory.

In the case now before us, the State raised no question, here or below, of Venner's standing to contest the seizure of the contraband. Perhaps he was thought to have the "automatic standing" recognized in *Jones v. United States*, 362 U. S. 257, 4 L.Ed.2d 697, 80 S. Ct. 725 (1960). In *Jones* the Court recognized two grounds for according standing: (a) when the crime charged is possession of the goods at the time of the seizure, and, (b) when the accused had a possessory or proprietary interest in, or was legitimately upon the premises at the time of the search.

In *Duncan v. State*, 276 Md. 715, 351 A. 2d 144 (1976), the Court of Appeals clearly held the automatic standing rule of *Jones* to be in force in Maryland, notwithstanding the development of other alternatives to the dilemma of both asserting and denying possession of the same goods at the same time. In any event, "standing" is not involved in the case now before us.

---

**2.** If one puts apples and oranges in the same pot, he gets neither applesauce nor orange marmalade. Sometimes the admonition is: "Don't scramble the eggs."

## The Fourth Amendment Does Not Protect Against Police Seizure Of Abandoned Property

Numerous cases have been concerned with the use of evidence once owned, possessed, or controlled by an accused, but which comes into the possession of the police after it has been abandoned or otherwise relinquished by him. An example is found in *Abel v. United States*, 362 U. S. 217, 4 L.Ed.2d 668, 80 S. Ct. 683 (1960). An alien suspected of espionage was arrested in his hotel room by immigration officers on an administrative warrant. Agents of the F.B.I. hovered in the background. When Abel packed his belongings and checked out of his hotel room to accompany the immigration officers, the F.B.I. agents, without a warrant, but with the permission of the hotel management, searched the vacated room. In a waste basket they found and seized two items later used, over objection, as evidence. One was a hollowed out pencil containing microfilm. The other was a block of wood containing a cipher pad. The Court said, at 241:

"No pretense is made that this search by the F.B.I. was for any purpose other than to gather evidence of crime, that is, evidence of petitioner's espionage. As such, however, it was entirely lawful, although undertaken without a warrant. This is so for the reason that at the time of the search petitioner had vacated the room. The hotel then had the exclusive right to its possession, and the hotel management freely gave its consent that the search be made. Nor was it unlawful to seize the entire contents of the wastepaper basket, even though some of its contents had no connection with crime. So far as the record shows, petitioner had abandoned these articles. He had thrown them away. So far as he was concerned, they were *bona vacantia*. There can be nothing unlawful in the Government's appropriation of such abandoned property. See Hester v. United States, 265 U. S. 57, 58[, 44 S. Ct. 445, 446, 68 L. Ed. 898]."

Another hotel room case is *United States v. Cowan*, 396 F. 2d 83 (2nd Cir. 1968). When a luggage thief had left his hotel room without paying his bill, and without removing the luggage from the room, the hotel manager took possession of the room, and removed the luggage. With the manager's consent, F.B.I. agents searched the room and the luggage. The luggage had been stolen from airline terminals at Kennedy Airport.

The U. S. Court of Appeals affirmed Cowan's conviction. The court said, at 86:

> "Cowan contends that the search and seizure of the luggage were unlawful. We hold that appellant does not have standing to raise this issue."

After a discussion of *Jones v. United States, supra,* the court went on to say, at 86-87:

> "In order to have standing to challenge the legality of a search, one must establish that he was the victim of an invasion of privacy. [Citations omitted]. While redress for persons aggrieved by searches and seizures originally depended upon proof of a superior property interest, recent decisions rest upon the constitutional right to the protection of privacy rather than any interest in the property which was subject to the search or seizure. * * * Here there was no invasion of Cowan's right to privacy. He had lost his right to use the room and with this the law gave the hotel the right to seize the property."
>
> * * *
>
> "Under these circumstances, Cowan's privacy was not invaded when the hotel manager permitted the federal agents to examine the contents of the baggage at the hotel or when the agents seized the baggage after Cowan's arrest. And since the hotel, not Cowan, was entitled to retain possession at the time when the baggage was seized there was no

interference with Cowan's property rights, such as they were, in the luggage."

* * *

"Moreover, we agree with Judge Weinfeld that the luggage had been abandoned at the time of the search. * * * Appellant argues that the abandonment doctrine does not apply because there was no unambiguous act of intentional discard * * *. Abandonment does not require performing a ritual; rather it is a question of intent." [3]

In *United States v. Maryland*,[4] 479 F. 2d 566 (5th Cir. 1973), the appellant and other occupants of a described automobile were arrested by a deputy sheriff on the request of a neighboring sheriff, who wanted them for passing counterfeit bills. The persons arrested were taken to the courthouse in a patrol car. A later search of the patrol car yielded five counterfeit bills between the seat and the cushion where appellant had sat. The bills were used as evidence against him at his trial.

After discussing *Jones v. United States, supra,* the court said, at 568:

"The Government's first argument is that appellant voluntarily abandoned the counterfeit bills in the police car when he exited from it without the bills and therefore had no standing to object *o the subsequent search by which they were discovered.

"We agree that the deputy's search of the police vehicle after appellant had exited from it was not directed against appellant within the meaning of *Jones* and did not invade any area in which appellant had a reasonable expectation of privacy. Further, we agree that if appellant's arrest was lawful, the abandonment was clearly voluntary."

3. See footnote No. 2. Again the court has "scrambled the eggs". It held that Cowan had no standing to attack the seizure, then proceeded to rule on the merits of that attack.
4. The full name of the appellant was Napoleon Maryland, Jr.

The court went on to hold that the arrest was lawful, therefore the abandonment was not brought about by unlawful police conduct.

The appellant in *United States v. Minker*, 312 F. 2d 632 (3rd Cir. 1962), *cert. denied*, 372 U. S. 953, 83 S. Ct. 952, 9 L.Ed.2d 978 (1963), was convicted of evading a tax based upon a lottery operation. A lawful search of Minker's apartment had yielded no incriminating evidence. Thereafter

" * * * government agents had arranged with Anthony Damore, a trash collector, to permit them to examine the contents of a trash receptacle located on the premises of the Hampden Boulevard apartment building, but outside the structure. The management of the apartment house had hired Damore to remove the trash three times a week. The receptacle was used by four tenants, as well as the building superintendent. The contents were examined off the premises, and the agents retained certain adding machine tapes and other slips of paper. Handwriting identified as Minker's appeared on many of these items. It is the taking of these articles from the trash can that is challenged here as being an unreasonable search and seizure.

"Prior to trial appellant presented a motion to suppress this evidence. The district court, after hearing, denied the motion, holding that Minker had abandoned the articles prior to the seizure by the government. At the trial objection was made to the introduction of this evidence. We think it abundantly clear that not only had Minker abandoned the property but, in addition, that the trash can was located outside an area that would entitle him to constitutional protection."

Still another abandonment case gave rise to *United States v. Mustone*, 469 F. 2d 970 (1st Cir. 1972). Secret Service agents had under surveillance a commercial premises at 3A Union Street, Boston, where they suspected a counterfeiting

operation was being conducted. One of the appellants, Brennan, was observed leaving the premises, carrying two large trash bags. The court detailed what followed:

"Brennan placed these bags on the sidewalk near some garbage cans 'several doors away' from 3A Union Street and then left the area. Both bags were tied closed. Kozak picked up these bags and deposited them in the Boston Secret Service office. When Agent Miller opened them the next morning he found a sheet of paper containing the impressions of three and one half counterfeit ten dollar notes and three aluminum offset plates stained with green ink.

"Based primarily on this evidence government agents obtained a search warrant for 3A Union Street and on March 18 searched the premises. They found approximately $242,000 in printed but uncut counterfeit ten dollar notes, an offset press, a vertical camera, a platemaker, a black attache case containing plates used to print counterfeit notes, and a large quantity of other printing and photographic supplies. Isabarrone's and Brennan's fingerprints were found on objects inside the back room. All three appellants were arrested shortly thereafter."

The court then stated the contention on appeal, and its holding. It said, at 972:

"On appeal appellants' primary contention is that the trial court erred in denying their Rule 41(e) motions to suppress the evidence found in the trash bags and during the search of 3A Union Street. With regard to the trash bags, appellants assert that the government's warrantless search and seizure of these bags violated Brennan's fourth amendment rights. They rely on People v. Krivda, 5 Cal. 3d 357, 96 Cal. Rptr. 62, 486 P.2d 1262 (1971), vacated 409 U.S. 33, 93 S. Ct. 32, 34 L.Ed.2d 45

(1972), and argue that Brennan had a 'reasonable expectation of privacy' as to the contents of these bags. In *Krivda* the California Supreme Court, citing Katz v. United States, 389 U. S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967), upheld a citizen's expectation of privacy as to the contents of a trash can placed on a public sidewalk awaiting pickup by municipal rubbish collectors. There the court upheld the suppression of evidence obtained during the warrantless search of the can. We are not persuaded by this authority, however, and hold that when Brennan deposited the bags on the sidewalk he abandoned them. Implicit in the concept of abandonment is a renunciation of any 'reasonable' expectation of privacy in the property abandoned. The contrary suggestion strikes us as anomalous."

In *Robinson v. State,* 13 Md. App. 439, 283 A. 2d 637 (1971), Chief Judge Orth, writing for this Court, made it clear that the seizure of discarded evidence, in an area where the accused had no justifiable right of privacy, is simply not within the protection of the Fourth Amendment. Two victims were robbed on the street by three men. Police arrived, and the victims pointed out the three men standing on a corner nearby. The police pursued them. Two of the men went into a building, and through a shoeshine parlor into a bathroom. An officer opened the door and ordered the men out. The officer found a pistol in a trash can in the bathroom. The gun was admitted in evidence over objection. We said, at 442-43:

"We hold that the search of the room and seizure of the evidence was not constitutionally proscribed. The Fourth Amendment protects '* * * the security a man relies upon when he places himself or his property within a constitutionally protected area * * * . There he is protected from unwarranted governmental intrusion.' *Hoffa v. United States,* 385 U. S. 293, 301. But it is what a person *justifi-*

*ably* seeks to preserve as private, even in an area accessible to the public, which may be constitutionally protected from unwarranted governmental intrusion, for 'the Fourth Amendment protects people, not places.' *Katz v. United States*, 389 U. S. 347. The capacity to claim its protection 'depends not upon a property right in the invalid place, but upon whether the area was one in which there was a *reasonable* expectation of freedom from governmental intrusion.' *Mancusi v. DeForte*, 392 U. S. 364, 368. Thus ' * * * the expectation of privacy is necessarily limited to that which is justifiable and reasonable; and what that encompasses depends upon and is controlled by the circumstances of each case.' *Kirsch v. State*, 10 Md. App. 565, 569.

"Robinson in oral argument before us conceded the legality of his warrantless arrest and clearly it was legal. *Wescott v. State*, 11 Md. App. 305. But the validity of the search and seizure here is not predicated upon it being incident to a legal arrest in any event. See *Chimel v. California*, 395 U. S. 752. It is simply that as to Robinson and Jones the 'bathroom' was not a constitutionally protected area. They hid in it at the approach of the police and the men they had robbed. Assuming that it was accessible to the public as a public restroom, they had no justifiable and reasonable expectation of privacy therein under the circumstances here. They cannot complain because the police entered the room and seized an article which, by a rational inference, they had discarded. *Davis v. State*, 2 Md. App. 630. This was no unwarranted governmental intrusion, nor lawless police conduct. *Brown v. State*, 3 Md. App. 90, is clearly factually inapposite. We hold that the lower court did not err in overruling the objection to the admission of the pistol, clip and cartridge. The search of the room and seizure of the evidence was not within the

protection of the Fourth Amendment and thus could not violate its guarantees."

See also *Davis v. State,* 2 Md. App. 630, 632, 236 A. 2d 307 (1967), *cert. den.,* 249 Md. 731 (1968), where we said that "one who abandons or discards property cannot complain with effect of the later seizure of such property by the police, or of its use against him in court."

There Was No Intrusion Into Venner's
Body To Obtain Evidence

We should not permit ourselves to fall into imprecise thinking because the evidence sought to be suppressed was in Venner's body when the police first learned of its probable existence. The contraband was not taken from his body, by the police or by anyone acting for the police. There was no intrusion into the body.

It was made clear by the Supreme Court in *Schmerber v. California, supra,* that such procedures as the compulsory drawing of blood from the body for testing purposes plainly constitute searches of persons, and depend antecedently upon seizures of persons within the meaning of the Fourth Amendment. The Court held in that case that the warrantless seizure of blood to test for alcohol was reasonable, given a lawful arrest, probable cause, an emergency in which delay threatened the loss of the evidence, and the taking of the blood by a physician in a hospital environment according to accepted medical practices.

The other extreme is illustrated in the case of *Rochin v. California, supra,* decided in 1952, before *Mapp v. Ohio, supra,* applied the exclusionary rule of *Weeks v. United States, supra.* Fourth Amendment reasonableness was not involved, but the Court held in *Rochin* that the methods used to obtain evidence violated due process of law. The Court said, at 172-73:

"It is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the

struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents — this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation."

A warrantless seizure of evidence, involving a borderline intrusion into the body, was held by the Supreme Court in *Cupp v. Murphy, supra,* to have been constitutionally permissible, and not in violation of the Fourth or Fourteenth Amendments. Murphy's wife was found strangled to death. There were abrasions and lacerations on her throat. Murphy, who was not then living with his wife, voluntarily came to the police station for questioning. The police suspected that a dark spot on Murphy's finger might be dried blood, and asked to take scrapings from his fingernails. Murphy refused. The police took them by force. The scrapings contained traces of skin and blood cells, and fabric from the victim's nightgown. They were used as evidence.

Drawing a limited analogy to *Chimel v. California,* 395 U. S. 752, 23 L.Ed.2d 685, 89 S. Ct. 2034 (1969), which defined the scope of a search incident to a valid arrest, and noting that the police had probable cause to arrest Murphy (although they had not done so), and noting "the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence", the Court approved the warrantless seizure in that case.

We refer to one other case involving an intrusion into the body, because of the similarity of certain facts to the present case. In *People v. Bracamonte,* Sup., 124 Cal. Rptr. 528 (1975), the Supreme Court of California reversed a conviction based upon evidence obtained by what the court held was an unreasonable search and seizure. California narcotics agents obtained a warrant to search the residence of Rita Bracamonte and her husband, their vehicles, and their persons. After the agents arrived, Mrs. Bracamonte

fled in one of the described vehicles. She was stopped nearby, and was seen to swallow some balloons. Agents took her, handcuffed, to a hospital, and on the strength of the warrant, asked a physician to pump her stomach. Because of Mrs. Bracamonte's strenuous resistance, she was strapped to a table by two nurses, and when she still refused to swallow an emetic solution, they passed a tube through her nose into her throat. After further resistance she gave up, and drank the solution. She regurgitated seven multi-colored balloons. They contained heroin.

The California court held that the warrant did not justify an intrusion into the appellant's body. It said that the warrantless intrusion was more than minor, and "that the high statistical probability that the balloons would 'pass through' constituted a condition other than the emergency situation in *Schmerber*." [5]

### The Balloons And Their Contents Were Abandoned By Venner

It could not be said that a person has no property right in wastes or other materials which were once a part of or contained within his body, but which normally are discarded after their separation from the body. It is not unknown for a person to assert a continuing right of ownership, dominion, or control, for good reason or for no reason, over such things as excrement,[6] fluid waste, secretions, hair, fingernails, toenails, blood, and organs or other parts of the body,

---

5. The court commented "that defendant in the instant case easily could have been transported to jail and placed in an isolation cell and kept under proper surveillance." We infer that the court was suggesting a policy of "wait and watch".

6. For an interesting fictional situation in which an eccentric Marylander, a Baltimorean and Eastern Shoreman, exercised posthumous dominion over his accumulated excrement, see The Floating Opera, by John Barth, 1967. Owner of a pickle processing plant at Cambridge, the testator, with a fetish for anything associated with his person, had accumulated 129 pickle jars filled with his excrement. He declared them to be part of the assets of his estate. A young Cambridge lawyer, representing the testator's son, defeated the rights of the widow under the will by proving that she had failed to preserve the assets of the estate — she had emptied the contents of the jars onto her flower beds.

whether their separation from the body is intentional, accidental, or merely the result of normal body functions.

But it is all but universal human custom and human experience that such things are discarded — in a legal sense, abandoned — by the person from whom they emanate, either "on the spot", or, if social delicacy requires it, at a place or in a manner designed to cause the least offense to others.

By the force of social custom, we hold that when a person does nothing and says nothing to indicate an intent to assert his right of ownership, possession, or control over such material, the only rational inference is that he intends to abandon the material. When one places, or permits others to place waste material from his body into the stream of ultimate disposition as waste, he has abandoned whatever legal right he theretofore had to protect it from prying eyes or acquisitive hands.

In this case the police did not confront or even see Venner at the hospital. He did not see them. There is nothing in the record to suggest that when the nurses, in the normal routine, took the bedpans from Venner's bed to the place for disposition of their contents, that it was a place where Venner had a constitutionally protected right of privacy. Nor is there anything to suggest that Venner exercised or attempted to exercise any right of possession or control over the balloons. They were abandoned by Venner. Their subsequent retrieval on behalf of the police was lawful. Their use as evidence was lawful.

*Judgment affirmed.*